```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                      AT BLUEFIELD
```

UNITED STATES OF AMERICA

v.                                    CRIMINAL NO. 1:05-00126

MAURICE TAFT GIBSON

### MEMORANDUM OPINION

Before the court is the applicability of the cross reference contained at United States Sentencing Guideline ("USSG") § 2D1.1(d)(1) to the sentencing of defendant Maurice Taft Gibson. USSG § 2D1.1(d)(1) provides that if a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 the sentencing court should apply the first degree murder guideline found at USSG § 2A1.1. For reasons expressed more fully below, the court has determined that the cross reference at USSG § 2D1.1(d)(1) should be utilized in this case.

### Procedural Background

Gibson, the leader of an extensive drug distribution operation, was named in fifteen counts of a twenty-count indictment.[1] Count One of the Indictment charged Gibson and others with conspiring to distribute quantities of cocaine and oxycodone, in violation of 21 U.S.C. § 846. Counts Two, Three, Four, and Thirteeen charged Gibson with distributing oxycodone, on or about April 20, 2004, April 26, 2004, May 10, 2004, and

---

[1] Counts Fifteen, Sixteen, and Seventeen were dismissed upon motion of the United States.

February 7, 2005 respectively.  Counts Eleven and Fourteen charged Gibson with distributing cocaine, on or about October 27, 2004 and March 9, 2005 respectively.  Count Twelve charged Gibson with distributing a quantity of hydromorphone, also known as "Dilaudid," on or about October 28, 2004.

Count Five charged that, on or about May 11, 2004, Gibson, aided and abetted by Hector Reinat, knowingly and intentionally distributed a quantity of cocaine.  Counts Eight and Ten charged that, on or about June 10, 2004 and September 16, 2004 respectively, Gibson, aided and abetted by Christina Louise Arnoto, knowingly and intentionally distributed a quantity of oxycodone.  Count Nine charged that, on or about July 27, 2004, Gibson, aided and abetted by Robert L. Gravely, knowingly and intentionally distributed a quantity of oxycodone.

Counts Eighteen, Nineteen, and Twenty all charged that Gibson engaged in specific acts of money laundering or conspiracy to commit money laundering.

After a three-day trial to a jury, Gibson was found guilty on all counts.  By Order entered February 26, 2007, the court granted Gibson's third motion for a new trial as to Counts One, Eight, and Ten.  The court later dismissed those counts on the government's motion.

By Order entered February 15, 2007, the court bifurcated Gibson's sentencing hearing and determined that it would first

take up the applicability of the murder cross reference. Accordingly, on February 27 and 28, 2007, the court held a hearing on the cross reference. Gibson's sentencing is scheduled to conclude on October 22, 2007.

## **Analysis**

USSG § 2D1.1(d)(1) provides that "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder) or § 2A1.2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined under this guideline." A court should apply the first degree murder cross reference in cases of premeditated killing. USSG § 2A1.1, App. Note 1; see also United States v. Abdullah, 2007 WL 2046801, *4 (4th Cir. 2007).

A court's "factual findings supporting the applicability of the murder cross reference" is reviewed for clear error. Abdullah, 2007 WL 2046801 at *4; United States v. Crump, 120 F.3d 462, 467-68 (4th Cir. 1997). "If the district court's findings `may rationally be said to be supported by a preponderance of the evidence, they may not be disturbed on appeal.'" Abdullah, 2007 WL 2046801 at *4 (quoting Crump, 120 F.3d at 468).

The court has applied a preponderance of the evidence standard in making the following findings.

3

At Gibson's trial, Agent E.H. Kennedy of the Drug Enforcement Administration ("DEA") testified that Mike White approached law enforcement and volunteered to make controlled drug buys from Gibson.  White was a tattoo artist who owned a business, Dragon's Den, located just off U.S. Route 460 on the outskirts of Princeton, West Virginia.  Also sharing space in the building where Dragon's Den was located was a shop called Psychedelic Dreams.  Christina Arnoto[2] was the owner of Psychedelic Dreams, a tobacco and accessory shop.  Arnoto and White became close friends.  Arnoto had known Gibson since 1998 and had an ongoing relationship with him in 2004.  According to Arnoto, Gibson sold her drugs.  White became a paid confidential informant and, in 2004, had Arnoto introduce him to Gibson.

From April 20, 2004, through March 9, 2005, White made a number of controlled buys from Gibson.  On June 10, 2004, Gibson and Arnoto met with White concerning rumors that White was working with law enforcement agents.  Apparently White was able to persuade Gibson that he was not an informant because Gibson sold drugs to White that day.  However, in the course of that conversation, Gibson made clear that he was no stranger to violence and that he was not to be crossed.  For example, Gibson

---

[2] Arnoto was one of the codefendants in this case.  She pled guilty to aiding and abetting the distribution of oxycodone and, pursuant to a motion for substantial assistance, was sentenced to a term of incarceration of 30 months.

admitted, among other things, that he had shot out the windshield of someone's car; threatened Hector Reinat telling him "I'm gonna kill your ass."; and beaten another person so badly that Gibson's hands were bleeding and he thought the other person was dead.

The evidence established that Gibson had numerous guns and at least one silencer. Over a 14-month period, from February 2004 through April 2005, Deano Hagerman sold approximately 18 guns to Gibson. Both Hagerman and William Harless testified that Gibson had five of his weapons modified for silencers. Kevin Davis testified that he had seen Gibson with multiple guns as well as a silencer. Gibson also told Davis that he could get silencers for him. Keyco Jones confirmed that he also had seen Gibson with multiple guns and a silencer. Gibson tried to purchase more silencers from Hagerman, using Dr. Robert Knox as a go-between. However, Hagerman never placed the order.

Law enforcement officers had been investigating Gibson's drug organization for years, even before Mike White's involvement, and Gibson's arrest was imminent on the date of White's murder. In addition to the evidence gathered from White's involvement, investigators monitored numerous telephone calls involving Gibson and others in his organization and installed a pole camera outside Gibson's Toledo Street property in Bluefield, West Virginia.

Mike White was murdered on May 19, 2005, between 2:00 p.m. and 2:30 p.m, in the parking lot of his tattoo parlor. White was killed by a single gunshot wound to the chest. Cheyanne Rode, White's daughter, stated that she arrived at the Dragon's Den shortly after 2:00 p.m.  Rode was with her two-year-old daughter Ariel.  Also present at that time were Tammy Smith, an employee of White's, and Arnoto.  Shortly after Rode's arrival at the Dragon's Den, Gibson came into the shop and retrieved a $500 down payment for a motorcycle he had previously agreed to buy from Mike White.  Gibson said he didn't have the money to complete the purchase.  Arnoto testified that she found this odd as she had never known Gibson not to have money.  Also, the evidence at Gibson's trial showed that he made substantial profits from his drug dealing, drove expensive automobiles, and owned real estate.

At some point after Gibson's arrival, he and White walked outside the Dragon's Den.  A few minutes later, Gibson walked back into the Dragon's Den and left with Arnoto.  Gibson and Arnoto went next door to Arnoto's shop.  White came back into his tattoo shop, looking for the car keys to a green Lincoln which he had for sale at the time.  The Lincoln was parked outside his shop and White apparently believed a prospective buyer wanted to test drive the car.  He realized the keys were already in the car and walked back outside.  A few minutes later, White screamed as

6

he was shot by someone seated inside the Lincoln in the driver's seat.

Cheyanne Rode, White's daughter, testified that the shooter was black because she saw his arm as he shot White.  The shooter was inside White's Lincoln, and White was standing outside the car on the passenger's side.  Rode testified that although she saw a gun, she did not hear a gunshot.  She further stated she saw a puff of smoke come from the end of the gun.  Rode testified that she was confused because she saw a gun but did not hear a gunshot; she thought White might have been having a heart attack.  Obviously, the shooter used a silencer as Rode, Arnoto, and Smith all testified that they did not hear a gunshot.  The black male sped off in White's Lincoln.  The Lincoln was found abandoned beside Route 460 about a quarter of a mile from White's shop.  Law enforcement agents concluded that someone in another vehicle had picked up the shooter and helped him escape.

Immediately after the shooting, Rode went to Arnoto's place of business to get help.  Gibson opened the door to Psychedelic Dreams and refused to help Rode, telling her that he "didn't know what's going on" and left the scene of the crime in his white Taurus.  Arnoto said she also asked Gibson for help after the shooting and Gibson told her he had "to get out of there."

7

It is clear to the court that Mike White's murder was not a random shooting; someone wanted Mike White dead. This was not a robbery gone afoul because nothing was taken from the person of Mike White nor was his shop robbed. Further, White's car was abandoned a short distance from the site of the murder. Law enforcement stated that they investigated other possible leads as to who might have wanted Mike White dead and their efforts excluded other suspects.

Detective Ted Jones testified that Gibson, Devin Clements, and Edward Hooks were together at Gibson's Toledo Street property at 12:57 p.m. on the day of White's murder. Film from the pole camera outside the residence showed the three men leave Gibson's property at that time in Gibson's white Taurus. Shortly after 2:00 p.m, Gibson showed up at the Dragon's Den and picked up the aforementioned $500 from White. Edward Hooks' green Mazda was also shown parked at the Toledo Street property and his cell phone was seized from the house the evening of Mike White's murder.

Devin Clements testified at Gibson's sentencing. Clements, Gibson's cousin, was only sixteen years old on the day of White's murder. Clements was also one of the three people that Detective Jones testified left Gibson's Toledo Street property with Gibson approximately an hour before White was murdered. When confronted with the video evidence from the pole

camera, Clements confirmed that he, Gibson, and Edward Hooks were the ones on the video and that they left the Toledo Street property together.  Clements testified that Gibson dropped him off at his home on Union Street.  Clements stated that he didn't see Gibson again until 5:00 p.m. or 6:00 p.m. that day.  Clements specifically denied that he, Gibson, and Hooks were together at Arnold Long's residence around 3:30 p.m. on the afternoon of May 19.

Arnold Long, a relative of both Gibson and Clements, testified that Clements, Gibson, and a person matching Hooks' description all came to his house on the day of the murder around 3:00 p.m. or 3:30 p.m.  They arrived in Gibson's white Taurus and stayed around 30 minutes.

It is clear to the court that Clements was not entirely truthful during his testimony.  First, Clements himself admitted that he was guilty of perjury before the grand jury.  Second, Clements denied going to Arnold Long's residence on May 19.  However, the court found Long's testimony credible on this point.  Therefore, it is obvious Clements lied under oath.

Soon after White's murder, Agent Kennedy and Detective Jones of the DEA interviewed Edward Hooks.  Hooks told them that he had never been to the Dragon's Den and that he didn't know Mike White.  However, Arnoto testified that she had seen Hooks and two other men at the Dragon's Den the Saturday before White

9

was killed.[3]  According to Arnoto, the men were looking at a car. The court found Arnoto credible and, therefore, concludes that Hooks was lying about never having been to the Dragon's Den. Upon conducting a search of Hooks' vehicle, a green Mazda, the officers seized a black t-shirt and a pair of black pants. Gunshot residue was found on the pants.

Antonio Chavis also testified at the hearing.  Chavis and Hooks were friends and both lived in Fayetteville, North Carolina.  Chavis also knew Gibson or "Mo" as he called him.[4] According to Chavis, Hooks made a couple of trips to Bluefield, West Virginia in May of 2005.  The two trips were made in close proximity to each other.  When Chavis questioned Hooks about why he was making a second trip to Bluefield so soon after having just returned, Hooks told him that Mo had called and he was going to see Mo.  Chavis called Hooks on his cell phone while Hooks was in Bluefield.

Upon Hooks' return to Fayetteville, Chavis said that he noticed a change in Hooks' personality.  According to Chavis, Hooks became quiet and nervous.  When Chavis showed Hooks a newspaper account of White's murder from the Bluefield paper, Hooks tore up the article and told Chavis to mind his own business.

---

[3] May 19, 2005, the date of White's murder, was a Thursday.

[4] Gibson's nickname was "Mo".

In late spring/early summer of 2005, Earl Moore was incarcerated at Southern Regional Jail with Gibson.[5] Gibson approached Moore about doing some legal research for him. Moore testified that Gibson, in discussing the murder of Jamaal Wallace,[6] told him that Wallace had been tortured and his throat cut. Gibson told Moore that it "was too bad they didn't have the opportunity to do that to Mike White." Gibson also told Moore that the police would never find the weapon used to murder Mike White.

Moore testified that he and Gibson discussed how Mike White was able to get close to Gibson. Gibson told Moore that he trusted Mike White and that "a fat girl" had introduced White to Gibson. Gibson told Moore that he trusted the "fat girl." Arnoto fits the description of a "fat girl." Moore also asked Gibson about the possibility of fingerprint evidence on the narcotics he sold to White. Gibson told Moore that he wiped his fingerprints off before selling the drugs to White.[7]

---

[5] Moore came to the attention of law enforcement when he wrote a letter to Detective Jones telling him that Gibson had threatened to kill Jones.

[6] The government spent a large portion of the evidentiary hearing offering 404(b) evidence regarding the murder of Jamaal Wallace, who was suspected of being a confidential informant against Gibson and his associates. For the most part, the court found this evidence unhelpful and, as the foregoing findings make clear, the evidence has not been relied upon to support the court's conclusion.

[7] During the trial, the court observed Gibson doing just this in the tapes of the controlled buys.

The court found Moore's testimony credible for several reasons. First, if Moore were lying and trying to set Gibson up, he would have specifically incriminated Gibson. Second, Moore knew details that could likely have only come from Gibson, including the fact that Arnoto had introduced White to Gibson and that Gibson wiped his fingerprints off the drugs before transferring possession. Gibson also told Moore that he "takes care of people that cross him," so Moore testified at some danger to himself.

Taken as a whole, the court believes that the foregoing evidence establishes by a preponderance that Gibson ordered the murder of Mike White and that, in all likelihood, the trigger man was Hooks. Gibson had motives for ordering the murder: to keep himself out of prison, to get even with White for informing on him, and to deter other potential government informants. Further, it is clear that Clements and Hooks are hiding something. Clements and Hooks had no reason for wanting Mike White dead: they were acting at the behest of Gibson. Significantly, law enforcement stated that they identified others who might have had reason to murder White and were able to exclude all of them. While the evidence falls short of meeting the proof beyond a reasonable doubt standard that would apply in a murder trial, the court is persuaded that it meets the preponderance of the evidence test that applies to sentencing

issues and concludes that the first degree murder cross reference should be applied.

The Clerk is directed to forward a copy of this Memorandum Opinion to counsel of record, the United States Marshal for the Southern District of West Virginia, and the Probation Department of this court.

IT IS SO ORDERED this 3rd day of October, 2007.

                        ENTER:

                        *David A. Faber* (signature)
                        David A. Faber
                        United States District Judge